**AMERICAN HOME PRODUCTS CORPORATION, Plaintiff,**

v.

**JOHNSON & JOHNSON, McNeilab, Inc., Saatchi & Saatchi, Compton, Inc., and Kallir Philips Ross, Inc., Defendants.**

**No. 85 Civ. 4858 (WCC).**

United States District Court, S.D. New York.

April 7, 1988.

Arnold & Porter, Washington, D.C. and New York City (Stuart J. Land, Jack Lipson, Thomas J. McGrew, Douglas A. Dworkin, Peter Kautsky, Duane K. Thompson, Randal M. Shaheen and Eric A. Rubel, of counsel), and Morrison & Foerster, New York City (Jack C. Auspitz, Kim J. Landsman, Charles F. Hagan, William P. Woods and Egon E. Berg, of counsel), for plaintiff.

Patterson, Belknap, Webb & Tyler, New York City (David F. Dobbins, of counsel), for defendants.

## OPINION AND ORDER

WILLIAM C. CONNER, District Judge.

Defendants (hereinafter "McNeil") have moved for reargument with respect to this Court's Opinion of February 8, 1988 denying Rule 54(b) certification of the Court's Order of November 5, 1987 dismissing McNeil's ninth counterclaim. Plaintiff ("AHP") initially responded that the motion should be stricken because it was filed in disregard of the Court's standing instruc-

tions requiring a pre-motion conference before the submission of any motion papers, but later filed a memorandum opposing the motion on the merits.

Notwithstanding McNeil's failure to comply with the Court's instructions, its motion will be considered. However, on reconsideration, the Court's previous ruling is reaffirmed.

### Background

McNeil's ninth counterclaim charged that McNeil lost sales of its acetaminophen-based over-the-counter ("OTC") analgesic, Tylenol, because the labels of AHP's competing OTC analgesic, Anacin, whose principal active ingredient is aspirin, failed to give adequate warning that children and teenagers who take aspirin while suffering from flu or chicken pox incur a substantial risk of contracting Reye Syndrome, a serious and often fatal disease.

McNeil sought Rule 54(b) certification of the Court's dismissal of this counterclaim so that, in the event the Court of Appeals reverses that dismissal and McNeil succeeds on the merits of the ninth counterclaim, the damage issues thereon, as to which McNeil had demanded a jury trial, could be tried jointly with those on the remaining claims, which are to be tried without a jury. McNeil argued that since all the damage claims involve the common factual issue as to the "lawful share" of the total OTC analgesic market which each of the competing products would enjoy in a market free of false or misleading advertising or labeling, if this issue is tried without a jury, it would have to be tried again before a jury to preserve McNeil's right to a jury trial.

In denying McNeil's motion for certification, the Court stated that attempting to determine the "lawful share" of each competitor in a utopian market free of unfair competition would be a futile exercise of "weighing the imponderable against the inscrutable," and basing damages on such a determination depended upon the "dubious assumption that the entire difference between this theoretical norm and the actual sales of a product is attributable to the particular false advertisements and labels involved in the several claims and counterclaims," in disregard of the myriad of other contributing factors, such as the differences in advertising and sales promotion expenditures and effectiveness.

### Discussion

In its motion for reargument, McNeil reasons that, whatever the merits of the "lawful market share" method of computing damages, that is the method which *both* parties have chosen, and they are entitled to present such claims to the trier of fact, unless the Court is prepared to rule, as a matter of law, that this is not an acceptable procedure for determining damages. McNeil based its assertion that AHP will use this method upon a document entitled "Notes on Calculation of Damages" which AHP had supplied to McNeil. In response to a specific inquiry from the Court, AHP confirmed that it will indeed seek to employ the method of computing damages set forth in this document.

However, the document does not describe the type of "global" estimate of market share that McNeil proposes to use in computing its own damages. Instead, reduced to the simplest terms, AHP's method begins with the results of a 1983 survey in which physicians were asked which OTC analgesics they were most likely to recommend for specific indications. The percentage of projected Advil recommendations thereby determined is applied to the known total of all OTC analgesic recommendations to give the expected total of Advil recommendations. From this total is subtracted the actual number of physician recommendations of Advil, as determined by SCRIPT-RAC, a widely used industry reference. The difference is assumed to be the number of physician recommendations lost due to McNeil's false or misleading advertising. This number is multiplied by the estimated percentage of physician OTC recommendations which are followed by patients to yield the number of expected Advil first sales based upon physician recommendations. This number is increased to reflect the estimated number of repeat sales to give the estimated total number of lost Advil sales. This number is multiplied by

the average factory price per sale to yield the dollar volume of lost sales, which in turn is multiplied by AHP's current gross profit percentage to give the total lost profits. These lost profits are reduced to reflect estimated gains in the sales of other AHP OTC analgesics as a result of McNeil's anti-ibuprofen campaign.

This method involves many highly questionable premises, most notably the assumption that the entire difference between the number of anticipated physician recommendations and the number of actual physician recommendations is attributable to false or misleading advertising by McNeil. This ignores the multitude of other factors which might have influenced physicians to recommend Advil fewer times than they originally anticipated, not least of which is the deluge of articles in medical journals which followed the introduction of Advil and which documented its various adverse side effects.

Still it appears more reliable, by several orders of magnitude, than the "lawful market share" method which McNeil proposes to employ, because it is narrowly focused on only one aspect of consumer demand—doctors' recommendations—and because it is based upon an actual survey of physicians. McNeil has not specified how it will attempt to prove the "lawful market share" of each OTC analgesic product; presumably it will rely upon the opinion testimony of marketing analysts. It is difficult to imagine how these experts will be able to make such a determination with any reasonable degree of reliability, considering the substantial differences between the various OTC analgesics, their mechanisms of action, their indications, contraindications and side effects, as well as the differences in expenditures for and methods of advertising them and otherwise promoting their sales. No doubt experts can be found who will not shrink from this wildly ambitious undertaking, and the Court is not presently disposed to exclude their expressions of opinion, however dubious.

But the Court cannot refrain from observing that there appears to be no need to rely on such vaporous speculations in proving damages in this case. It is a matter of record what the sales of Tylenol and Advil have been, not only during the period of publication or use of each false or misleading advertisement or label, but theretofore and thereafter. The change in sales volume during the period of the offending conduct would appear to be the most logical starting point for determining the loss occasioned thereby. A final determination of the damages would, of course, involve making allowances for a complex of ancillary considerations such as the time lag between the onset of the unfair advertising or labeling and its effect on sales and its "hangover" effect following its discontinuance, as well as such extraneous factors as unfair competition by others, favorable or unfavorable publicity about the analgesic in question or about one or more of the competing products, and so on.

Such damage determinations would inherently be made separately for each unfair advertisement or label at issue. It would not be necessary to make a "global" determination of "lawful market share" and therefore no reason to lump all of the damage issues for resolution in one plenary trial. Whether or not this is the method which is used by either party is, of course, up to them and their respective counsel.

But, for the present purpose of deciding McNeil's motion for reargument, it is only necessary to ascertain that AHP will not attempt to establish the "lawful market share" of Advil. The motion for reargument is therefore granted to the extent that McNeil's motion for Rule 54(b) certification has been reconsidered and, upon reconsideration, is again denied.

SO ORDERED.